CHARLES ED OWENS v. THE STATE.

No. 14960. Delivered April 6, 1932.

The opinion states the case.

*A. M. Felts,* of Austin, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is assault with intent to murder; the punishment, confinement in the penitentiary for two years.

W. F. Phillips, the injured party, testified, in substance, as follows: Appellant had been coming to his house during his absence to see his daughter. He had endeavored to talk to him about the matter, but appellant had avoided him. On the occasion of the assault, he had seen appellant on school property behind a closet on the bank of a hollow, which was near his (the witness') home. Appellant was armed with a double barrel shotgun. Arming himself with a pistol, he went to appellant for the purpose of telling him to quit coming to his house. He

intended to slip up on appellant without being seen by him. As he reached appellant, with the pistol in his hand, and while he and appellant were practically together, appellant fired a shot with the shotgun, which ranged to the side of his face. He grasped the shotgun and pushed it off. Appellant then fired a second shot, and after they clinched, appellant struck him with the shotgun. A scuffle ensued, in which appellant took his pistol away from him. The pistol had six loaded cartridges in it. The witness' daughter approached the scene and appellant ran away, carrying the pistol with him. Appellant made no effort to shoot him with the pistol. As appellant ran off, the witness told him he was a coward. At this point we quote from the testimony of the injured party as follows: "It is not a fact that Owens (appellant) told me before he shot at me to drop the pistol. He did not. He did not speak a word only he said 'G— d— you Phillips'. That was all he said. He was the worst scared man ever I saw. After the tussle was over he took the pistol away from me. As to how many loaded shells in the pistol after he took it away from me. It had six shells. He run off. Yes. At that time I did not have a gun. Nothing but his empty shotgun. He had my loaded pistol. As to whether he did not offer to shoot me. He threatened to kill me and my daughter both. I told him he was a coward. He had my loaded pistol with six shells. I did not have anything to shoot with. I was disarmed. He did not walk off, no he ran off. Anyway he left, yes. He did not attempt to hurt me when he had the only loaded gun there, and that is all I know anything about, yes sir. As to why he ran off, he run down the hollow on the hill and got a tree on us. When he broke loose and ran my daughter came running up to us, towards us with a bar of iron in her hand. I suppose he thought it was a gun."

The daughter of the injured party gave testimony substantially the same as that of her father. She testified that appellant had been coming to her house during the absence of her father. She admitted on cross-examination that she had written love letters to appellant, but declared that he had forced her to write such letters. She testified that she had not cared for appellant and had not wanted him to come to her home.

Appellant introduced several witnesses who testified that the injured party had told them that he was going to kill appellant if he did not quit coming to his home. One witness testified that the injured party had requested him to bring appellant to his home, saying that if he ever laid eyes on appellant he would kill him. This witness said that the injured party told him he would pay him well if he would bring appellant to his home. Other witnesses for appellant testified to having carried letters from the injured party's daughter to appellant.

Appellant testified, in substance, that while he was behind the closet on the school grounds he saw the injured party coming toward him with a pistol in his right hand; that he had no desire to hurt the injured party,

but seeing that he was coming upon him, he stepped out from behind the closet and told him to drop his pistol; that the injured party fired one shot from the pistol at him; that when this shot was fired he threw his shotgun to his shoulder and fired one shot; that after firing the second shot with the shotgun he and the injured party clinched; that he took the pistol away from the injured party, and walked away from the scene of the difficulty; that as he left, the injured party called him a cowardly s— of a b— for leaving. We quote from the testimony of appellant at this point as follows: "When I shot at him with the shotgun he was coming up the hill straight toward me, yes. I did not want to hurt him. I wanted to keep him from shooting. He shot, and then I wanted to make him quit. I could not see him when I shot the second time. When he came down there I had been in the toilet about twenty or twenty-five minutes."

Appellant testified, further, that there was nothing to keep him from shooting the injured party after he disarmed him. He said: "I did not at that time expect to hurt him or desire to hurt him and never intended to hurt him unless in self-defense. No sir, I did not. What I did that morning was absolutely and solely in self-defense. Yes. If I had not done something he would have killed me to the best of my knowledge. He had a pistol and was advancing on me. I did not go on his premises. Where that occurred was off of his premises on school house grounds. The land belonged to the school house."

On cross-examination, appellant testified, in part, as follows: "I fired the first shot when I told him to drop his gun, and he fired, and then I fired but I didn't intend to hit him. I wanted to make him quit shooting. I did not intend to hit him at all when I fired the first shot. I did not have it in my heart to hit him, or to hurt him."

Appellant testified, further, that he had been going to the home of the injured party during his absence for the purpose of seeing his daughter; that he would go to the school grounds and watch for a signal from her; that if she put out a white cloth he was advised her father was away from home; that he and the daughter were engaged to be married and he inteded to marry her; that on the occasion of the assault he had gone to the school grounds upon the request of the injured party's daughter for the purpose of going to her house in the event her father was away from home. He said, further, that the injured party's daughter had written him many letters, but declared that he had not forced her to write the letters. He said that he had been advised by parties that the injured party had threatened to do him bodily injury.

Appellant strenuously insists that the evidence is insufficient to support the conviction. We think his contention should be sustained. That the injured party approached appellant with a pistol in his hand was shown by the state. That appellant had ample opportunity to shoot him after

he disarmed him is apparent. Again, as the injured party approached appellant there seems to have been nothing to prevent appellant from hitting him at the time he fired the first shot with the shotgun if he intended to kill him. While it is true that the jury were not bound to accept appellant's testimony to the effect that he did not intend to kill the injured party, the facts and circumstances developed by both the state and defense supports appellant's version of the transaction. In the light of the testimony of the state, appellant was in an unenviable position when he was confronted by a man with a drawn pistol. It would seem but natural that he felt called upon to take some action to protect himself. We entertain such grave doubt as to the sufficiency of the evidence as that we are unwilling to permit the conviction to stand. See Hightower v. State, 117 Texas Crim. Rep., 42, 35 S. W. (2d) 723; Powell v. State, 116 Texas Crim. Rep., 34, 28 S. W. (2d) 142.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.